Lapiece et. al. *v.* Hughes.

| 24 | 69 |
|----|----|
| 72 | 257 |

### P. M. LAPIECE et al. *v.* JEFFERSON J. HUGHES.

Where a defendant has a valid defence to a suit at law, but is absent and does not know of the institution of the suit until after judgment against him, equity will interpose and grant a new trial, although the sheriff had made a return "executed" by leaving a copy of the writ at the residence of the party. *Jones* v. *Commercial Bank of Columbus*, 5 How. 43, cited and confirmed.

The same rule will apply where a general return of executed is made on a writ, if it be proved that in fact the same was by copy left at the residence of defendant in his absence, of which he did not receive notice in time to defend at law.

If any of the subsequent indorsers of the original note had taken it up by giving their own in payment of it, such party might have sued H. upon his prior indorsement; but where the original note was taken up or discharged by the substitution of another note by the maker, all the parties to the first note were discharged from liability, unless they entered into some new contract to continue their liability.

On appeal from the southern district chancery court, at Natchez; Hon. James M. Smiley, vice-chancellor.

The facts of the case will be found in the opinion of the court, and the points made by counsel.

*R. M. Gains,* for appellants, filed no brief in the case.

*C. P. Smith*, on the same side.

*Montgomery & Boyd*, for appellee.

The excuse offered for not making defence at law is, substantially, that the complainant had no knowledge of the existence of the suit until too late a period to get to the court before it adjourned.   The proof in support of this is too plain to need an argument.   Smith proves that the writ was first discovered by Hughes at Yazoo city, one hundred and fifty miles, or four days' ride, by land, from Natchez, where the court was held, on the 6th June; and the record shows that the court adjourned on the 8th June, leaving two days only to make the trip.   And Mr. McMurran testifies that Hughes arrived at Natchez on the 9th, and employed him to undertake the defence of his interest. This promptness shows too plainly that his sudden alarm at finding the writ was not feigned, for the case commanded too much attention at that time to leave any reason to believe he had seen the writ before, and had forgotten it.   He had just returned from Natchez, where he had been with Walker and others, settling another lot of notes made by the same parties; and he certainly had no reason to decline defending it at that time, unless he forgot it; and his solicitude on the subject forbids the supposition that he would have forgotten it a moment, if he had ever seen the writ.   This view is strengthened by the fact stated by Smith, that Hughes was not at bank on the day the sheriff's return shows the service to have been made.   This would be ample evidence of itself, without the depositions of the sheriff and his deputy, which are objected to as incompetent.   But we insist they are competent, because they are not called to impeach the return, but to explain it. The bill does not seek to get rid of the judgment at law on account of a false return, but to obtain a new trial because he had not notice of the suit.   The sheriff is as competent as any other witness to show how the service was *made in* case of ambiguity, as one fact tending to raise a presumption that the party had not such notice.   The return is simply " executed," which is ambiguous, because it may have been executed by reading it to him, or leaving a copy with his wife, or a free

Lapiece et al. *v.* Hughes.

white person over sixteen years, of age found at his house, he being from home; or by placing a copy in some conspicuous place about his dwelling-house, in case no white person were found there. It was competent for the sheriff to explain his return in this respect. It is true the proof shows that the return was false, but that does not render the sheriff incompetent as a witness. His incompetence depends on the object for which his evidence is introduced. If for the purpose of impeaching his return, he is incompetent, because his return is matter of record, and it is fitting that some evidence shall be of so high a nature, that it imports absolute verity. Coke.

We therefore contend that the complainant has shown a valid excuse for failing to make defence, or move for a new trial in the circuit court. And if he has a good defence, he should have a new trial. Freeman, Ch. R. 85–92; S. & M. Ch. R. 473, 474; Walker, R. 505; 5 Howard, R. 43, 539; 7 S. & M. R. 513.

The defences are two-fold: first, he denies that he had any notice of the non-payment and protest of the note sued on. As *primâ facie* evidence, he proves the death of the notary who appears to have protested the note, and produces his notarial record: this notarial record proves that notices were sent to some of the indorsers, but opposite Hughes's name commenced writing the name of the place to which notice was sent, or was to be sent, and made only the letters "*ma,*" and erased them. Without explanation, this would satisfy any person that no notice had been sent to Hughes, either from having doubts as to the place, or some other cause. The explanations given by Munce do not relieve it from the difficulty, as he clearly shows that, according to Redman's habits of business, the erasure would indicate that notice had not been sent. As this was all the evidence on the subject of notice, in connection with the positive allegation that no notice had been received, it raises a sufficient *primâ facie* case to set aside a judgment by default.

The other defence was of more importance, and was most fully made out. It was proved by Howell and Quitman that this note was left in bank after maturity, to the great inconvenience of the maker and indorsers. And the principal debtors

gave a new note, with the same indorsers except Hughes, which was accepted by the holder as satisfaction, and the old note delivered to Quitman, to hold for purposes agreed on between him and the parties to the note. Now, if Quitman had substituted his own note and taken this up, it would have been equivalent to a payment by him, and he could have sued Hughes forthwith; as, however, the principal debtors substituted their note, it must be considered equivalent to a payment by them, which extinguished the note. If McMillan had retained the old note, and sought to enforce it against Hughes, he could not have succeeded, because he had, for valuable consideration, given an extension of sixty days to the principal debtors. 5 Howard, R. 634; 4 Ib. 692; 6 S. & M. 433–439; 2 Vesey, Jr., 539–544; 1 Story, Eq. 320, 321.

Howell's testimony fully bears me out in the assertion above. He knew the only condition on which McMillan would give time was the payment of some money; and although the entries on the books were not made until some days subsequent to the date of the new note, yet the memorandum "11 Mar.," together with the circumstances that such cash transactions were not always entered on the books on the day they occurred, but noted by memorandum put in the cash drawer, leave but little room to doubt that the transaction took place on the 11th March, which was a day before the date of the new note. The amount of the new note, being equal to the old note and ten per cent. interest up to the maturity of the new notes, shows that the payment, although called interest on the books, was in truth a bonus given for the extension of time.

Lapiece claims to be an innocent holder; but the truth is, the note was assigned to him many years after protest, and under such circumstances he takes it, subject to all the equities existing between the parties; and, by our statute, he takes it subject to all payments, failure of consideration, discounts, &c., existing previous to notice of assignment.

*McMurran*, on the same side.

The defendant in error had no legal notice of the commencement of the suit in the circuit court, or of the judgment, &c.

The note sued on was paid at maturity by giving another note, not indorsed by Mr. Hughes. The proofs show, in my opinion, that the new note amounted to a payment of the old one. Story on Prom. Notes, 500, § 404; 12 East, R. 576; 12 John. R. 510; Chitty on Bills, 441.

But if the court should determine that it was not a payment, but that the new note was a renewal of the old debt, then it was unquestionably an extension of time, without Hughes's consent, for sixty days, and Hughes as a surety is discharged. And this, too, is a ground for equity to interfere. And if the court should sustain the bill on this ground as to the defence, I conceive that the injunction prayed for ought to be made perpetual. *Rees* v. *Benington*, 1 Vesey, jr. 539–542.

Thus equity will interfere in such a case and grant a new trial, or perpetually enjoin the judgment obtained under the circumstances disclosed. *Herring* v. *Winans*, 1 S. & M. Ch. R. 466; *Jones* v. *Com'l. Bank, Columbus*, 5 Howard, R. 43. And as to the mode of serving process under the statute, see How. & Hutch. Dig. 583, § 27.

Where it is against conscience that the party should hold on to the advantage he has at law, or where the judgment is obtained without notice, or by fraud or accident, the party suffering will have relief in equity. 2 Story, Eq. 173, § 887; 2 Amer. Eq. Dig. 64, § 32, 36, citing *Morgan* v. *Scott*, 1 Ala. R. 81; Walker, 505.

The proof is conclusive that Hughes, as soon as he had notice that the suit had been brought, repaired with the greatest expedition to Natchez, where the court was held, but arrived there after the court adjourned. But another circumstance, making this one of the strongest possible cases for relief, is that Walker, one of the defendants to this suit, and interested in the note, acknowledged service for Howell, one of the principal parties to the note, and had it dismissed as to him, and thus was the means of preventing Hughes from making his defence. For Howell testifies that if he had been served with process, or known of the suit, he would have had pleas put in for Hughes and the other indorsers, as a duty on his part; this, under the law, would have postponed a trial till the next term, and Hughes

would have had the opportunity to make his defence, and would have made it.

Mr. Justice YERGER delivered the opinion of the court.

Lapiece obtained a judgment by default, in the Adams circuit court against the appellee, as indorser of a note executed by A. McNiel & Co. for the sum of $6,666.33. The appellee filed a bill to enjoin the judgment, and for a new trial at law, because, as the bill alleges, he never received notice of the protest and non-payment of the note; and secondly, because after its maturity and non-payment, the holder of it, without his knowledge or consent, received from the maker part payment, and received another note from the maker, payable at sixty days after date, for the balance, which note so taken in renewal has been paid. The process at law is returned with the general return of " executed." But the bill states, that it was not served personally upon complainant, but that the service was by a copy of the writ left at his place of business in his absence, and that he did not know of the pendency of the suit or the service of the writ until it was too late to defend, or move for a new trial at law. Upon this point, the proof is satisfactory and clear. The complainant lived in Yazoo city, formerly known as Manchester, and was cashier of the Commercial Bank. It is proved that the sheriff received the writ on the 16th of May, 1843, and that he took a copy of it to Yazoo city, to hand to Hughes, on the 17th of May; that Hughes was absent on that day, and that the copy was left on a table at the banking-house. Hughes did not reside at the banking-house, but lived about three hundred yards distant. Smith, one of the witnesses, proves that a few days after the 17th of May, Hughes went to Natchez, and did not return for several days, and that on his return, while looking over his papers, on the 6th of June, in the bank, he discovered the copy, and expressed great surprise at finding it, asking witness why he had not informed him that it had been left. To which witness replied, that he was ignorant of the fact himself. Hughes immediately, in half an hour, went to Benton to see the sheriff, and ascertain from him what he had done with the writ; and finding it had been returned " execu-

ted," he left for Natchez on the following day, on a steamboat, and reached there on the 9th of June. The court had then adjourned, and he at once applied to counsel to learn in what way he should proceed to get relief on the facts stated. This court has held, that where a defendant has a valid defence to a suit, but is absent, and does not know of the institution of the suit until after judgment against him, equity will interpose and grant a new trial, although the sheriff had made a return of " executed " by leaving a copy of the writ at the residence of the party. *Jones* v. *Commercial Bank of Columbus,* 5 Howard, 43. The same rule must be applied where a general return of " executed " is made on the writ, if it be proved, that in fact the service was by copy left at the residence of defendant in his absence, of which he did not receive notice in time to defend at law. By so doing, the return of the sheriff is not contradicted; on the contrary, the return is admitted to be true. Yet although true, that notice which the law intended a party should have, of the pendency of a suit against him, may not have been received.

The common rule, that a defendant shall not contradict the return of a sheriff, collaterally, we do not controvert; yet in this State, where the statute authorizes service, either personally and directly, or constructively by leaving a copy at the residence of a party, if the rule were established that the defendant could not show, in case of a general return of " executed," that the service was in fact only constructive, and that actual notice of the suit was not received by him, irremediable injury and wrong, under the forms of the law, would often be perpetrated. Where actual or personal service is required, if the sheriff returns a writ " executed," and in fact it has not been executed, a defendant can hold him liable in an action for false return, if he is damaged thereby. But where the service may be personal and direct, or constructive by means of a copy, as in this State, the sheriff's return of " executed " may be true in every particular, and he therefore not liable for damages for a false return, and yet the defendant may never have received the copy, or known of the existence of the suit, and therefore not have defended it, when he may have had full and ample defence, and would

have made it, if that notice of the suit which the law intends should be given, had been actually received. While it is admitted that at law no relief against a judgment so obtained could be granted; a court of equity would be limited and circumscribed in boundaries too narrow to render it of much practical utility, if it could not grant relief. This brings us to the consideration of the question, whether the defence alleged to exist, would have been sufficient, if made at law, to have defeated the action. We think it would. The bill alleges that complainant was indorser of the note sued on, and that he did not have notice of its presentment for payment, and of its non-payment, and there is no proof in the record that such notice was ever given. On the contrary, the proof almost establishes that it was not given.

But again it is said, that the note sued on was paid by another note given by the maker in its stead. The facts on that point are these. The note was made by McNiel, and indorsed by Sprague first, Howell second, Hughes third, Walker fourth, Colton fifth, and Quitman sixth, indorsers. On its maturity and non-payment, the holder agreed to take part payment from the maker, and to renew for the remainder by another note of the parties, at sixty days, which arrangement was made in the absence of Hughes, and without his knowledge or consent. A part of the note was paid, and a new note of the maker, indorsed by all the other parties to the first note, except Hughes, payable at sixty days, for the remainder, was given to the holder, who delivered the first note to Quitman, in order that it might be sued on against Hughes, if it could be legally done, for the use of such party to the last note as might have it to pay. Subsequently, Walker and Quitman paid the last note, and Walker, who was a prior indorser to Quitman, repaid him, and Quitman gave him up the first note indorsed by Hughes, which note Walker transferred to Lapiece; and the question is now, can Hughes be held liable on this state of facts, as indorser? We think he can not. While it is true, that if either of the subsequent indorsers of the original note, had taken it up by giving their own in payment of it, such party might have sued Hughes upon his prior indorsement; yet we think it equally clear, whenever the original note

was taken up or discharged by the substitution of another note by the maker, all the parties to the first note were discharged thereby from liability upon it, unless they entered into some new contract or agreement to continue their liability. Under this view of the case, the decree of the Vice-Chancellor must be affirmed.

SMITH, C. J., gave no opinion, having been of counsel.